**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Obed HOYTE, Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Anif Christopher WILLIAMS,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kenton Omar PERRIN, Defendant–**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kenton Omar PERRIN, Defendant–**
**Appellant.**

**Nos. 94–5340 to 94–5342 and 94–6500.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 8, 1994.

Decided April 21, 1995.

---

**ARGUED:** J. Lloyd Snook, III, Snook & Haughey, P.C., Charlottesville, VA, for appellants. Kelli Renee Orndorff, Student Counsel, U.S. Attorney's Office, Roanoke, VA, for appellee. **ON BRIEF:** John S. Hart, Green & O'Donnell, Harrisonburg, VA, for appellant Hoyte; Michael T. Hemmenway, Dygert & Associates, Charlottesville, VA, for appellant Perrin. Robert P. Crouch, Jr., U.S. Atty., Ruth E. Plagenhoef, Asst. U.S. Atty., Roanoke, VA, for appellee.

Before WILKINS and LUTTIG, Circuit Judges, and LAY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Affirmed by published opinion. Senior Judge LAY wrote the opinion, in which Judge WILKINS and Judge LUTTIG joined.

## OPINION

LAY, Senior Circuit Judge:

Obed Hoyte, Anif Christopher Williams, and Kenton Omar Perrin were convicted under 21 U.S.C. § 846 and 18 U.S.C. §§ 2, 924(c), and 1959(a)(1) for conspiracy to distribute and distribution of cocaine base, use of a firearm, and murder for the purpose of improving or maintaining their positions in a RICO enterprise. On appeal they raise nu-

merous trial errors. We affirm the judgments of conviction.[1]

The three defendants were operating a drug distribution ring in Charlottesville, Virginia. Dwayne Durrett was a crack user and occasional dealer for the defendants. Durrett was found murdered on the night of March 17, 1993, by the side of U.S. Route 250. He had been shot three or possibly four times. A nine millimeter bullet casing was found near the body.

Several witnesses testified at trial that the three defendants had been looking for Durrett the night of his murder and that Durrett was avoiding them. Durrett was observed to have had a sizeable quantity of crack shortly before his murder that he may have stolen from the defendants. Testimony also established that Hoyte owned a nine millimeter pistol.

A key witness for the Government was Densie Beckford. He had been named in the original indictment with eight other codefendants. He testified he had seen Hoyte and Williams shoot at Durrett and stand over his body. Beckford heard Hoyte say "He's not dead. Let's go get the car and come back." Williams then drove the car back and he, along with Hoyte and Perrin, put Durrett in it. Beckford also told of a later conversation he overheard in which Hoyte and Williams said that after they had taken Durrett out of the car, Hoyte told Williams to shoot him again to make sure he was dead.

Beckford had entered into a plea agreement prior to trial. It was brought out at trial that Beckford had made two prior inconsistent statements about Durrett's murder. When he was first arrested in May 1993, Beckford denied all knowledge of the murder. In October of 1993, while negotiating a plea bargain, he told an FBI agent a second story to the effect that he had heard something about Durrett's murder from Hoyte but had not personally observed it. When Beckford told that story to a polygraph examiner, he failed the test. After jury deliberations began, an FBI agent told one of the defense attorneys that after Beckford had failed the polygraph test, Beckford had told

him a completely different story. This version of the incident was that the defendants had enticed Durrett into their car with a promise of giving him some marijuana and then shot him later.

In their joint appeal, the defendants contend (1) the court erred in denying a new trial because of Beckford's undisclosed statement; (2) they were prejudiced by testimony referring to their ethnic background and to a certain rap music tape in which Hoyte said "murder;" and (3) there was insufficient evidence to support a conviction for murder "for the purpose of ... maintaining or increasing position in" a RICO enterprise under 18 U.S.C. § 1959. In addition, they contend the court erred in denying Hoyte a continuance, in failing to dismiss the charges against Williams on double jeopardy grounds, and in refusing to direct a verdict in Perrin's favor.

## THE FAILURE TO DISCLOSE

■ The defendants claim the Government's failure to disclose all the accounts Beckford gave of the murder violated their constitutional right to a fair trial. Under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), the defendants have the right to *favorable* evidence that is of *material* import in the determination of guilt or punishment.

To prevail on this issue, the defendants must show the undisclosed statement is both favorable to them and material. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)).

Beckford's undisclosed statement was that "they" (the defendants) lured Durrett into the car by offering him marijuana, intending to kill him. In this version of the murder, Beckford did not specifically single out which

---

1. Hoyte and Williams received sentences of life imprisonment. Perrin received a sentence of 360 months; he was not convicted of a firearms charge.

defendants lured Durrett into the car. The trial court concluded the statement was accordingly not specifically exculpatory to any of the three defendants.

■ If we consider Beckford's undisclosed story as true, it is clear it is not favorable in the sense it does not specifically exculpate anyone. The statement can be generally understood as showing that Perrin along with Hoyte and Williams was involved in luring Durrett into the car. There are two other statements that implicate the defendants including Perrin in the shooting of Durrett. First, there is testimony that on the same day of the shooting, Perrin was riding in an automobile with Hoyte and Williams looking for Durrett. There is also the testimony of Pernell Washington that in response to his inquiry about the murder, Perrin laughed and said that "He [Durrett] shouldn't have f----- with us." Further, there was credible testimony that Hoyte owned a nine millimeter gun and that a shell casing for a nine millimeter gun was found at the scene of the murder. In light of the totality of the evidence, we conclude Beckford's undisclosed statement was not exculpatory to any of the three defendants.

■ If we consider Beckford's undisclosed statement as false, it may be favorable to the defendants in the sense of impeaching Beckford's testimony. *See Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (requiring new trial because of failure to disclose promise of immunity to principal witness). The defendants argue that full disclosure of all of Beckford's prior inconsistent statements would tend to show he kept changing his story until he invented a version the Government liked.

The trial court held Beckford's additional story would not have changed the trial's outcome because Beckford was impeached in so many other ways. Counsel cross-examined Beckford about his two prior inconsistent stories. The jury learned Beckford used several aliases and had false ID. The jury heard Beckford was a drug dealer and had signed a plea agreement. They did not have to believe his statement that he expected nothing in return for testifying. Counsel brought out that, in exchange for Beckford's testimony, the quantity of drugs he was charged with would be reduced, he would receive a decrease in his offense level for acceptance of responsibility, one of the charges against him would be dismissed, and he would receive a recommendation for sentencing at a lower level than the Guidelines would otherwise allow. The trial court found, given the extent to which Beckford was impeached, there was no reasonable possibility that airing the undisclosed version would have changed the result of the case.

■ We agree with the trial court's analysis.[2] Although the nondisclosure of the statement did give rise to a colorable argument, we conclude on the basis of the overall evidence that further impeachment of Beckford would not, within reasonable probability, have caused a different result.[3]

## EVIDENTIARY CHALLENGES

Defendants argue the trial court erred in permitting the government and its witnesses to refer to them as "Jamaicans" and in refusing to declare a mistrial after the jury heard testimony that Hoyte made a rap tape in which he used the word "murder."

■ Defendants rely on *United States v. Doe*, 903 F.2d 16 (D.C.Cir.1990), where the court found inadmissible expert testimony describing how "Jamaican" drug dealers had "taken over" the crack trade in Washington D.C. The court noted the prosecutor's men-

---

**2.** Whether the government was in good or bad faith in failing to disclose the statement is not significant. *See id.* at 154. It appears the prosecution did not deliberately withhold the statement and did not know of it until the FBI agent revealed Beckford's additional version.

**3.** Many other circuits have dealt similarly with the issue of cumulative impeachment evidence. *See, e.g., Routly v. Singletary*, 33 F.3d 1279, 1285–86 (11th Cir.1994) (per curiam); *United States v. Quintanilla*, 25 F.3d 694, 698–99 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 457, 130 L.Ed.2d 365 (1994); *Andrews v. Collins,* 21 F.3d 612, 626 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995); *United States v. Kozinski*, 16 F.3d 795, 818 (7th Cir.1994).

tion of that fact in closing argument and his repeated references to the defendants as "Jamaicans." Defendants also cite *United States v. Rodriguez Cortes*, 949 F.2d 532, 542 (1st Cir.1991), where the court similarly found inadmissible a card identifying the defendant as a Colombian which was "used as the basis for making generalizations about all Colombians."

We note both *Doe* and *Rodriguez Cortes* deal with evidence that had little probative value and significant prejudicial effects. Here, the term was relevant and had more than marginal probative value. Several witnesses who bought drugs from the defendants or knew them through their own participation in the drug trade, only knew the defendants by their street names, one of which referred to them collectively as the "Jamaicans." Use of the name by witnesses was thus evidence which linked the defendants together as members of a drug conspiracy.

Further, the court had difficulty understanding several witnesses, including Beckford, who were Jamaican and spoke Jamaican patois which Beckford described as "broken English." The court found identification of the defendants and several witnesses as Jamaican relevant in explaining how they communicated with each other.

Defendants fail to show how the references to them as Jamaicans provided a basis for the jury to make prejudicial generalizations. *See United States v. Blackwood*, 913 F.2d 139, 143 (4th Cir.1990) (rejecting defendant's contention that knowledge of his Jamaican citizenship would inflame jury's xenophobic hostility). We find the references relevant and not prejudicial. We also note that voir dire included questioning prospective jurors on the issue of bias against Jamaicans.

■ As to the second claim of error, Tonya Washington testified Hoyte had made a rap tape which she had listened to, understanding only one word—"murder." The court denied defendants' motion for a mistri-

al but did instruct the jury to disregard all the questions and answers involving the tape. Because the jurors did not hear the tape itself, heard very little testimony about the tape, and were instructed to ignore what they did hear, we find the court did not abuse its discretion in denying a mistrial.

## SUFFICIENCY OF EVIDENCE FOR SECTION 1959 CONVICTIONS

■ The Government sought to prove Durrett's murder was committed for the purpose of "maintaining or increasing [the defendants'] position[s] in an enterprise engaged in racketeering" in violation of 18 U.S.C. § 1959(a)(1).[4] The government asserted the defendants murdered Durrett to intimidate people from interfering with their drug dealing.

The defendants argue the evidence was insufficient to convict them on this charge. They contend other cases interpreting section 1959(a) involved convictions on evidence of a position-related motive far more extensive than that presented against them. *See e.g., United States v. Brady*, 26 F.3d 282 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 246, 130 L.Ed.2d 168 (1994); *United States v. Rosa*, 11 F.3d 315, 340–41 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994); and *United States v. Concepcion*, 983 F.2d 369 (2d Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993). The defendants distinguish these cases as involving elaborate criminal organizations with rules or criteria for advancement and which concerned the killing of competitors. The defendants claim there is no evidence that they had policies governing advancement or that Durrett was a competitor of theirs, or even that they killed Durrett because they learned he had stolen crack from them. Defendants contend every murder by a drug dealer has the effect of intimidating others, but that does not mean every drug-related killing is a violation of section 1959. The government failed, they

---

4. Title 18 U.S.C. § 1959 provides:
  (a) Whoever, ... for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders ... shall be punished—

  (1) for murder, by death or life imprisonment, or a fine under this title, or both;....

maintain, to show actual position-related intent.

Challenges to the sufficiency of evidence must overcome a heavy burden. We consider the evidence in the light most favorable to the government, making all inferences and credibility determinations in its favor. *See United States v. Williams,* 41 F.3d 192, 199 (4th Cir.1994) (citing *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942)), *cert. denied,* — U.S. —, 115 S.Ct. 1442, 131 L.Ed.2d 321 (1995).

Testimony established several incidents in which defendants threatened and physically harmed others. The jury heard testimony that the defendants had monopolized night time crack sales in the Rockland Avenue area, that they threatened or beat up James Burns and Tony Waller for either stealing from them or for failing to pay for crack, that later on Perrin told Pernell that Durrett was murdered for interfering with them, and that the other defendants bragged at a bar in Washington, D.C. about killing someone for "disrespecting" them. By helping to load Durrett into the car, Perrin aided and abetted Hoyte and Williams in his murder. We conclude a reasonable jury could have found beyond a reasonable doubt that the murder was committed in furtherance of the defendants' drug trafficking.

## CONTINUANCE

Hoyte argues the trial court erred in failing to grant him a continuance. Hoyte's former counsel was forced to withdraw from the case. His replacement counsel was notified of his appointment to represent Hoyte on November 9, 1993, when trial was scheduled to begin December 7. Counsel had less than thirty days to prepare for trial. 18 U.S.C. § 3161(c)(2) provides that "the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel. . . ."

We review the failure to grant a continuance for abuse of discretion. *See United States v. Williams,* 10 F.3d 1070,

1079 (4th Cir.1993), *cert. denied,* — U.S. —, 115 S.Ct. 313, 130 L.Ed.2d 276 (1994). To prevail, the defendants must show the denial prejudiced their case. *See United States v. Larouche,* 896 F.2d 815, 823 (4th Cir.), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990).

Hoyte's initial counsel was appointed on May 19, 1993. The docket shows Hoyte's counsel was active in making discovery motions and other pretrial motions prior to Hoyte's arraignment. Hoyte appeared before the court with his original counsel at his arraignment on September 8, 1993. Even before the thirty day period had begun to run, Hoyte's first lawyer had done substantial work. Hoyte's replacement counsel had almost the full thirty days provided by statute, from November 9 to December 7. 18 U.S.C. § 3161(c)(2) does not say that a defendant must have the same attorney throughout the thirty day period. Counsel does not explain in specific detail what preparation he was unable to accomplish before trial. We find no abuse of discretion in denying the continuance.

## DOUBLE JEOPARDY

Williams claims the conspiracy with which he is charged in this case is one to which he already pled guilty and for which he was sentenced to sixteen months in prison.[5] In that case, the Fifth Amendment's prohibition of double jeopardy would require his conviction for conspiring to distribute crack cocaine be reversed.

In *United States v. MacDougall,* 790 F.2d 1135, 1144 (4th Cir.1986) and *United States v. Ragins,* 840 F.2d 1184, 1188 (4th Cir.1988), we applied the "totality of the circumstances" test for determining whether successive conspiracy charges involved charging for the same offense. We consider five factors: (1) the time periods of the conspiracies; (2) the place where the conspiracies occurred; (3) the co-conspirators; (4) the overt acts done in furtherance of the conspiracies; and (5) the substantive statutes

---

5. Williams' first conviction was for distributing .17 grams of crack on August 7, 1992, aiding and abetting in the distribution of .36 grams of crack on August 8, 1992, and conspiring with Robert Lee Cook and others to distribute crack cocaine.

involved. *Id.* at 1189. We apply the factors flexibly, with no pre-assigned weight given to any factor. *United States v. McHan,* 966 F.2d 134, 138 (4th Cir.1992).

We note the time period of the second conspiracy, September 1991 through March 1993, included the first conspiracy, August 7–8, 1992. Both conspiracies involved drug sales in the Rockland Avenue area of Charlottesville, but they involved different co-conspirators. Both conspiracy charges alleged, among other overt acts, an August 7, 1992 sale of crack, although at the trial, the court prohibited the government from putting on any evidence concerning that sale. The first conspiracy centered around a territory sharing agreement between competitors while the members of the second conspiracy cooperated in acquiring and selling crack. Both conspiracies involved the violation of 21 U.S.C. §§ 841(a)(1) and 846.

We find the differences between the conspiracies highly significant. William's co-conspirator for the first conspiracy was Robert Cook. Their agreement was to divide up the Rockland Avenue territory, each selling crack from a different location. In the instant conspiracy, William's co-conspirators were in a partnership with him to sell crack and the evidence strongly suggested the defendants murdered Dwayne Durrett because he interfered with that business. The fact the first conspiracy concluded on August 8, 1992 with Williams' arrest while the second conspiracy commenced before, and continued after, his arrest also differentiates them. We hold there was no double jeopardy.

### DIRECTED VERDICT

Finally, Perrin claims the district court erred in failing to direct a verdict in his favor on the charge of having aided and abetted Hoyte and Williams in the murder. The only testimony which linked Perrin to the killing came from Beckford who said that Perrin helped load Durrett's body into a car after he was shot. Perrin also insists the evidence did not establish Durrett was dead when he helped to put him in the car. Further, he contends there is no evidence that he had any position in a RICO enterprise. Perrin claims the evidence presented to jurors was insufficient as a matter of law for them to find, beyond a reasonable doubt, that he aided and abetted the murder.

We disagree. Several witnesses testified to Perrin's frequent presence on Rockland Avenue and to the fact he sold crack. As previously discussed, in addition to Beckford's testimony, there was Pernell Washington's testimony that Perrin had explained in vulgar terms why Durrett was murdered, a statement from which it can be reasonably inferred that Perrin had a position in a RICO enterprise. A juror could readily infer that Perrin's assistance in loading Durrett into the car was intended to maintain his position in enterprise. As to whether Durrett was dead at that time, Beckford testified that after the shooting, he heard Hoyte say that Durrett was still alive. In addition, a few weeks later, Beckford overheard Hoyte and Williams talk about dumping Durrett on U.S. 250 and shooting him again. The evidence was sufficient to support Perrin's conviction on this charge.

*AFFIRMED.*